UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

UNITED STATES                           CRIMINAL ACTION

VERSUS                                  NO: 12-198

WALTER PORTER, ET AL.                   SECTION: R

**ORDER AND REASONS**

Before the Court is the Government's notice of intent to introduce at trial intrinsic evidence, or, in the alternative, extrinsic evidence pursuant to Federal Rule of Evidence 404(b). Defendant Walter Porter opposes the introduction of evidence linking him to four previous bank robberies.  Defendant Terrance Lodrig objects to the introduction of evidence relating to the alleged acquisition of a stolen vehicle for use in the charged robberies.  He also opposes the admission of evidence of his alleged laundering of proceeds from one of the charged robberies. For the following reasons, the Court finds that evidence of Porter's alleged involvement in the four uncharged bank robberies is admissible as intrinsic evidence explaining how Porter allegedly recruited his co-defendants to join the charged conspiracy.  In the alternative, the evidence is admissible under Rule 404(b) to prove modus operandi and intent.  The Court reserves judgment as to whether evidence concerning the acquisition of the stolen vehicle is admissible against Lodrig, but in any event, evidence of its use in furtherance of the

alleged conspiracy is admissible against all defendants, including Lodrig.  Finally, the Court finds that the evidence of Lodrig's alleged involvement in laundering the proceeds of the charged robberies is admissible against him as to Counts Six and Seven.

## I.    BACKGROUND

On May 24, 2012, the government issued a five-count indictment against Walter Porter and Brian Keith Hayes, charging both with one count of conspiracy to commit armed bank robbery, two counts of armed bank robbery, and two counts of use of a firearm in furtherance of the bank robberies.[1]  On May 9, 2013, the government filed a First Superseding Indictment, realleging Counts I-V against Porter and adding three new defendants: Robert Taylor, London Carter, and Terrance Lodrig.[2]  Hayes negotiated a plea with the government and was not charged in the Superseding Indictment.  The charges as to each defendant were as follows:

(1)  Count One, Conspiracy to Commit Armed Bank Robbery, is alleged against all four defendants;

(2)  Count Two, Armed Robbery, corresponds to the July 6, 2011 robbery of the Capitol One Bank at 6307 Elysian Fields in New Orleans.  Porter and Taylor are charged

---

[1] R. Doc. 1.

[2] R. Doc. 57.

in this count, and the Government alleges that Hayes participated as well.

(3)    Count Three, Use of a Firearm During and in Relation To a Crime of Violence, corresponds to the July 6, 2011 robbery and is alleged against Porter and Taylor.

(4)    Count Four, Armed Robbery, corresponds to the August 26, 2011 robbery of the Capital One Bank at 2200 North Causeway in Metairie. Porter, Carter, and Lodrig are charged in this count, and the Government alleges that Hayes also participated.

(5)    Count Five, Use of a Firearm During and in Relation To a Crime of Violence, corresponds to the August 26, 2011 robbery and is alleged against Porter, Carter and Lodrig.[3]

On August 22, 2013, the grand jury returned the Second Superseding Indictment, realleging Counts I-V and adding two additional counts.[4]  Count VI charged Lodrig with conspiracy to make a false statement in a federal matter.  The charge stems from an alleged agreement among Lodrig, Hayes, and other conspirators to tell a false story about the laundering of Hayes's and Lodrig's shares of dye-stained loot from one of the two robberies.  Porter is mentioned in the overt acts as having

---

[3] R. Doc. 57.

[4] R. Doc. 123.

attempted to clean red dye stain from the stolen money and having advised Hayes and Lodrig that they could exchange the money at a casino, but he is not charged in Count VI.  Count VII charges both Porter and Lodrig with conspiracy to commit money laundering based on the same series of events.

On August 26, 2013, the Government filed a notice of intent to introduce evidence relating to "other acts" that one or more defendants allegedly committed.[5]  As to Porter, the Government seeks to introduce evidence of the following:

(1)   the September 9, 2009 armed robbery of the Capital One Bank located at 1100 South Carrollton Avenue in New Orleans;

(2)   the October 2, 2009 armed robbery of the Capital One Bank located at 2200 North Causeway in Metairie;

(3)   the December 8, 2009 armed robbery of the Omni Bank located at 637 South Carrollton Avenue in New Orleans;

(4)   the December 15, 2009 armed robbery of the Capital One Bank located at 6235 South Claiborne Avenue in New Orleans;

(5)   the 2011 acquisition of a stolen 2010 Ford Fusion for use as a the getaway car in both charged robberies; and

(6)   the 2011 laundering of Lodrig's share of the proceeds from the August 26, 2011 bank robbery.

_____

[5] R. Doc. 125.

4

The Government also seeks to introduce items (5) and (6) against Lodrig and Carter, and item (5) against Taylor, although it alleges that Porter was the defendant who acquired the stolen vehicle.

The Government argues that the 2009 bank robberies are admissible as intrinsic evidence of the conspiracy.  It alleges that Carter, Taylor, and Lodrig chose to join the conspiracy based on Porter's detailed account of the successful 2009 robberies, and that the 2009 robberies are therefore "inextricably intertwined" with the formation of the 2011 conspiracy.  In the alternative, the Government argues that the 2009 robberies are admissible under Federal Rule of Evidence 404(b), because the similarities between the 2009 and 2011 robberies speak to the identity, intent, and knowledge of the perpetrators, as well as to the existence of a common scheme or plan.  Porter objects to the introduction of evidence of the earlier bank robberies.  He argues that evidence of the 2009 robberies is not intrinsic to the crimes charged because the two sets of robberies are separated by nearly two years, and because there is no evidence that they were part of the charged conspiracy.  Porter also contends that there is no evidence linking any member of the conspiracy to the 2009 robberies other than the allegation that Porter was one of the two perpetrators of the 2009 robberies. As for the Government's alternative

argument that the robberies are admissible under Rule 404(b), Porter argues (1) that the 2009 and 2011 robberies are not sufficiently similar to be probative identity or the existence of a common scheme or plan; (2) that the 2009 robberies are irrelevant to the question of intent, because Porter does not allege that he was an ignorant or innocent participant in a conspiracy to commit the 2011 robberies, but rather than he was not involved at all; and (3) that the robberies were not sufficiently complex for the 2009 robberies to prove that Porter had the requisite knowledge to commit the 2011 robberies. Finally, Porter argues that the evidence is more prejudicial than probative.

Lodrig opposes the Government's use against him of evidence of the acquisition of the getaway car and of his alleged money laundering activities. He argues that the car in question was acquired before he is alleged to have joined the conspiracy. He also objects to the use against him of evidence of the alleged money laundering, although apparently only for the purposes of Counts One, Four, Five and Six, and not as to Count Seven, the money laundering conspiracy charge. The Court has reviewed the contested evidence and the parties' arguments and now rules as follows.

## II.  DISCUSSION

The Government seeks to introduce evidence of "other acts" that Porter and Lodrig allegedly committed.  The evidence implicates Federal Rule of Evidence 404(b), which provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

FED. R. EVID. 404(b).  The Fifth Circuit and other courts have interpreted the phrase "other crimes, wrongs, or acts" to embrace only those acts that are "extrinsic" to the crimes charged in the indictment.  *See United States v. Aleman*, 592 F.2d 881, 885 (5th Cir. 1979).  Evidence of "intrinsic" acts "does not implicate Rule 404(b), and consideration of its admissibility pursuant to Rule 404(b) is unnecessary." *United States v. Coleman*, 78 F.3d 154, 156 (5th Cir. 1996).  In general, evidence of other acts is intrinsic "when the evidence of the other act and evidence of the crime charged are 'inextricably intertwined' or both acts are part of a 'single criminal episode' or the other acts were 'necessary preliminaries' to the crime charged." *United States v. Williams*, 900 F.2d 823, 825 (5th Cir. 1990).  Thus, before a court decides whether Rule 404(b) bars the introduction of certain evidence, it must make a threshold inquiry into the relationship between the evidence and the crimes charged in the indictment.  If the evidence is intrinsic to one or more of the

7

charges, the additional requirements of Rule 404(b) are inapplicable.

If a court determines that the challenged evidence is extrinsic to the charged offenses, it must then apply the two-part test developed in *Beechum*, 582 F.2d at 909-18, to determine whether the evidence is admissible. *See United States v. Sumlin*, 489 F.3d 683, 690 (5th Cir. 2007). First, the Court must determine whether the evidence is "relevant to an issue other than the defendant's character," such as motive, intent, or knowledge. *Beechum*, 582 F.2d at 911. Second, the evidence must have "probative value that is not substantially outweighed by its undue prejudice and ... meet[s] the other requirements of rule 403." *Id.*

The relevance of extrinsic offense evidence is determined by Federal Rule of Evidence 401, which provides that evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. *Id.*; Fed. R. Evid. 401. The relevance of an extrinsic offense "is a function of its similarity to the offense charged," and similarity must be determined with respect to the particular issue to which the extrinsic offense is addressed. *Beechum*, 582 F.2d at 911. In any event, "similar act evidence is relevant only if the jury can reasonably conclude that the act occurred

and that the defendant was the actor." *Huddleston v. United States,* 485 U.S. 681, 689 (1988) (citing *Beechum,* 582 F.2d at 912-13).

In making its relevance determination, the Court is not required to make a preliminary finding that an extrinsic act or offense in fact occurred. *Huddleston,* 485 U.S. at 688-89. The Court instead admits extrinsic offense evidence under Federal Rule of Evidence 104(b), which requires the Court to "examine[ ] all the evidence in the case and decide[ ] whether the jury could reasonably find the conditional fact ... by a preponderance of the evidence ." *Id.* at 690. The Court has broad discretion to control the order of proof at trial and may allow the Government to introduce evidence concerning a similar act subject to a later assessment of whether sufficient evidence has been offered to permit the jury to make the requisite finding. *Id.* Only if the Government ultimately fails to meet this "minimal standard of proof" must the Court instruct the jury to disregard the evidence that was conditionally admitted. *Id.*

In determining whether extrinsic offense evidence has probative value that is not substantially outweighed by its undue prejudice and also meets the other requirements of Federal Rule of Evidence 403, the court conducts a "commonsense assessment of all the circumstances surrounding the extrinsic offense." *Beechum,* 582 F.2d at 914. The Court considers the availability

9

of other means of proof of the charged offense, and it is the
"incremental probity" of the extrinsic evidence that must be
balanced against its potential for undue prejudice. *Id.* Thus,
if a defendant's intent is not contested, the probative value of
extrinsic evidence as to that issue will be inconsequential. *Id.*
Furthermore, the probative value of an extrinsic offense
"correlates positively" with its similarity to a charged offense.
*Id.* at 915. If the extrinsic offense and the charged offense are
dissimilar in most respects, "the extrinsic offense may have
little probative value to counterbalance the inherent prejudice
of this type of evidence." *Id.* Finally, the Court considers the
amount of time separating the extrinsic offense from the charged
offense. *Id.* Temporal remoteness is not dispositive, but it
"depreciates the probity of the extrinsic offense." *Id.*

### A.   The 2009 Bank Robberies

The Government argues that evidence of the 2009 robberies is
intrinsic to the charged conspiracy to commit the 2011 robberies,
because Porter's detailed explanation of the methods he allegedly
used in the 2009 robberies is "inextricably intertwined with [the
other defendants'] decision making process in becoming involved
in the conspiracies and substantive crimes . . . ."  The
Government alleges that Porter "discussed his involvement in,
planning, style of committing these bank robberies, his handling

and disposition of the bank robbery proceeds, including his washing of bank robbery money, and his knowledge of exchanging bills at casinos with others to persuade them to participate with him in future bank robberies."

When a conspiracy is alleged, the Fifth Circuit gives somewhat greater latitude in characterizing evidence as intrinsic. *United States v. Girod*, 646 F.3d 304, 320 (5th Cir. 2011) (citing *United States v. Brown,* 388 Fed.App'x 455, 460 (5th Cir. 2010) (per curiam) (unpublished) (ruling that defendants' drug use was intrinsic to a conspiracy to steal mail, because the conspiracy's origin was a desire to obtain financial information from the mail in order to purchase merchandise that would later be traded for drugs)). Evidence is therefore intrinsic to a conspiracy if it is relevant to establish how the conspiracy came about, how it was structured, and how each conspirator became a member. *United States v. Watkins*, 591 F.3d 780, 784 (5th Cir. 2009) (citing *United States v. Nichols,* 750 F.2d 1260, 1265 (5th Cir.1985)). Evidence of similar crimes occurring before the formation of the conspiracy is admissible if it sheds light on the circumstances under which the conspiracy was formed, because "[e]vidence of the establishment of the conspiracy . . . [is] a legitimate part of the government's proof in establishing the conspiracies charged." *United States v. Lokey*, 945 F.2d 825, 834 (5th Cir. 1991) (quoting *United States v. Nichols,* 750 F.2d 1260,

11

1265 (5th Cir.1985)). The Fifth Circuit has characterized drug transactions that pre-dated an indicted conspiracy as intrinsic evidence when the evidence was "not submitted to show the defendant's proclivity towards crime, but . . . as background information establishing the connection between a witness and a defendant." *United States v. Williams*, 277 F. App'x 472, 475 (5th Cir. 2008) (per curiam) (unpublished) (quoting *United States v. Miranda,* 248 F.3d 434, 440–41 (5th Cir. 2001)). *See also United States v. Royal*, 972 F.2d 643, 648 (5th Cir. 1992) (admitting evidence of pre-conspiracy drug transactions between co-defendants because "it allowed the jury to understand the nature of the relationship between the [coconspirators] and evaluate whether it was likely that the [d]efendant[s] would have conspired"); *United States v. Nguyen*, 213 F.3d 638 (5th Cir. 2000) (per curiam) (unpublished) (holding that evidence of a "prior criminal act" committed by the defendant was intrinsic to the charge of bank robbery, because the criminal act was inextricably intertwined with another individual's decision to help Nguyen rob the bank).

In *Miranda*, the Fifth Circuit upheld the admission of witness testimony regarding drug transactions between the witness and the defendant that occurred before the formation of the indicted conspiracy, because those transactions constituted "part of the background facts surrounding the commission of the crime."

248 F.3d at 440 (quoting *United States v. Wilson*, 578 F.2d 67, 72 (5th Cir. 1978)). The testimony merely completed the witness's account of her dealings with the defendant. *Id.* at 441. In this case, a Government witness is apparently prepared to testify that Porter described his techniques in a number of past successful robberies in order to convince the charged coconspirators to participate in the 2011 robberies. Such testimony would be instrumental to the Government in discharging its burden of establishing the existence of an agreement to commit the charged robberies. As in *Royal*, the evidence will assist the jury in determining whether it was likely that the defendants would have conspired. Porter's alleged claims of extensive, successful experience robbing banks could provide his potential coconspirators confidence that the scheme was feasible. The Court finds that the probative value of the evidence, introduced for the purposes described above, will outweigh the risk of unfair prejudice.[6]

---

[6] The Government stated in its brief that it "anticipates" presenting testimonial evidence as to each bank robbery. It goes without saying, of course, that the Government may introduce corroborating evidence of only those robberies that its witness will testify were described to him by Porter. The Government has proffered no other evidence connecting Porter to any of the 2009 robberies, so they are irrelevant except to the extent that they were described by Porter in his alleged attempts to recruit the coconspirators. *See Huddleston,* 485 U.S. at 690; *see also* FED. R. EVID. 104(b).

Even if not intrinsic to the charged conspiracy, evidence of the four uncharged bank robberies is admissible as extrinsic act evidence under Rule 404(b).  Assuming that the Government's witness testifies as planned, a reasonable jury could find by a preponderance of the evidence that Porter committed the four robberies.  Because of the similarities between the uncharged and charged bank robberies, evidence of the former is relevant to assist the jury in determining the identity of the perpetrators in the latter two robberies.

Evidence of prior crimes is admissible to prove identity under Rule 404(b),

> if the circumstances of the extraneous act were so similar to the offense in question that they evince a signature quality-marking the extraneous act as the handiwork of the accused.  Indeed, proper identity evidence is tantamount to *modus operandi* evidence.

*United States v. Guerrero*, 169 F.3d 933, 939 (5th Cir. 1999) (quoting *United States v. Sanchez*, 988 F.2d 1284, 1393-94 (5th Cir. 1993) (internal quotation and citations omitted).  Two factors are relevant to this inquiry: the distinctiveness of the crimes and the proximity of the crimes in space in time.  *U.S. v. Castaneda*, CRIM.A. No. 05-41684, 2007 WL 836932, at *3 (5th Cir. 2007) (per curiam) (unpublished) (citing *Guerrero*, 169 F.3d at 939).

As for the proximity in space and time of the charged and uncharged crimes, all six robberies occurred in New Orleans and

Metairie, an adjacent suburb.  More importantly, one of the uncharged robberies took place at the Capital One Bank located at 2200 North Causeway in Metairie, which was also the site of one of the charged robberies.  The charged crimes began within nineteen months of the last of the uncharged robberies, all of which occurred within roughly three months of one another.  Thus, the robberies occurred well within the time period in which they could be deemed relevant.  *See United States v. Broussard,* 80 F.3d 1025, 1040 (5th Cir. 1996) (ten years); *United States v. Pollani,* 218 F.3d 743, at *3 (5th Cir. 2000) (eight years); *United States v. Chandler,* 368 Fed. Appx. 495, 500 (5th Cir. 2010) (17 years).

Defendant cites *United States v. Myers*, 550 F.2d 1036, 1046 (5th Cir. 1977), for the proposition that evidence of the uncharged robberies is inadmissible, because (1) the similarities they share with the charged crimes are nothing more than generic components of armed bank robberies, and (2) a different number of perpetrators participated in the charged and uncharged robberies. In *Myers*, the Court rejected the Government's *modus operandi* theory because,

> [a]n early afternoon robbery of an outlying bank situated on a highway, by revolver-armed robbers wearing gloves and stocking masks, and carrying a bag for the loot, is not such an unusual crime that it tends to prove that one of the two individuals involved must have been the single bandit in a similar prior robbery.

15

*Id.*  The Court distinguished the facts of the case from those in *United States v. Cavallino*, 498 F.2d 1200 (5th Cir. 1974), where just three years before it had admitted evidence of prior, uncharged bank robberies under Rule 404(b).  The commonalities among the robberies in *Cavallino* more closely approximate the characteristics shared by the charged and uncharged robberies in this case, and the Court finds that case instructive.

In *Cavallino*, the Court noted the following similarities between three uncharged robberies and the charged offense:

(1) Each robbery victim was a bank;

(2) A person who had participated with the defendant in each of the three previous robberies was persuasively linked to the fourth, which was also committed by more than one person;

(3) The participants had a meeting before each robbery;

(4) A stolen or "hot" car of General Motors manufacture was used to approach and leave each bank;

(5) A rented or "cool" car, obtained at a rental agency, was used after the "hot" car was abandoned in each case;

(6) In each crime, the "hot" car was parked at the bank's rear door and the robbers entered and departed by the rear door;

(7) All four robberies were committed between 9 a.m. and 11:30 a.m.;

16

(8) In all four crimes one robber was armed with a revolver, and in one of the uncharged crimes and the charged crime, another robber was armed with a sawed-off shotgun;

(9) Each robbery was "quick and apparently timed with precision."

*Cavallino*, 498 F.2d at 1207.  The Court also noted that in defendant's confession to the three uncharged robberies, he indicated that, in his opinion, 9-11 a.m was the best time to rob a bank, and an airport rental agency was the best place to rent a "cool" car.  The Court in *Myers* also found it significant that in *Cavallino*, there were three uncharged robberies similar to the charged crime, as opposed to only one uncharged crime in that case.  *Myers*, 550 F.2d at 1047.

Here, the Government alleges that the charged and uncharged robberies share the following characteristics:

(1) Each robbery occurred at a bank located in New Orleans or suburban Metairie;

(2) Notably, one of the uncharged robberies occurred at the same bank that was hit in the August 26, 2011 charged robbery;

(3) Three of the four uncharged robberies took place at Capital One Bank branches, as did both of the charged robberies;

17

(3) All the robberies were armed, "takeover style" robberies;

(4) Each robbery involved the use of a stolen getaway car, which was abandoned in all cases except the July 6, 2011 charged robbery, because the car was reused in the August 26, 2011 robbery;

(5) Each robbery involved the use of a trailing driver in a separate vehicle;

(6) In each robbery, all perpetrators wore some type of hat;

(7) A witness account contained in a police report indicates that one of the perpetrators in the September 9, 2009 uncharged robbery wore an "NY" baseball cap, and in both charged robberies, one of the perpetrators also wore an NY baseball cap;

(8) In at least two of the uncharged robberies, as well as both the charged robberies, the perpetrators each wore at least one latex glove;

(9) In at least two of the uncharged robberies and in the August 26, 2011 charged robbery, one of the perpetrators jumped the teller counter,

(10) According to the Government, the perpetrators in each robbery told victims at gunpoint not to look at them;

(11) The government also alleges that in each case, the perpetrators placed an emphasis on identifying the

18

commercial teller stations, which Porter believed contained
more cash; and

(12) After both the December 15, 2009 uncharged robbery and
the August 26, 2011 charged robbery, Porter allegedly
distributed to another robber proceeds that had been washed
to remove the red ink from exploded dye packs.

As in *Cavallino*, there are multiple uncharged robberies
bearing similarities to the charged crimes, unlike in *Myers*,
where there was only one.  Additionally, the government claims to
have evidence that Porter believed commercial teller stations
contained more cash, and that he placed "emphasis" on robbing
commercial teller stations in both the charged and uncharged
crimes.  If shown at trial, this connection would be strikingly
similar to the facts of *Cavallino*, where the defendant had
expressed his preference for committing robberies at a certain
time of day and using a certain type of stolen vehicle, and then
proceeded to follow his own advice in both the charged and
uncharged robberies.

In excluding evidence of an earlier robbery, the Court in
*Myers* emphasized that the uncharged crime was committed by a lone
gunman, while the charged robbery was committed by two
perpetrators.  In this case, the uncharged crimes were committed
by two individuals, while the charged robberies were committed by
three, with an additional individual waiting in the trailing

19

vehicle.  While significant, this distinction is not determinative.  The transition from a lone gunman to a team player as alleged in *Myers* is a much more significant difference than a mere increase in personnel.

A slightly more troubling distinction is that the perpetrators of the uncharged crimes wore bandannas or masks to obscure their faces, while there is no evidence of their use in the charged crimes.  If this were a case in which the crimes shared only generic characteristics, this distinction could be sufficient to overcome those commonalities.  But because the charged and uncharged crimes have atypical similarities, this possible distinction does not compel exclusion of the evidence. In particular, the NY ball cap, the return to the 2200 North Causeway bank, the focus on Capital One locations, the use of both stolen getaway cars and trailing vehicles, and the emphasis on commercial teller stations are unusual enough that, in conjunction with the numerous, more "generic" features shared by the charged and uncharged crimes, they tend to mark the robberies as the handiwork of the accused.

More recent opinions reinforce the Court's conclusion.  In *Guerrero*, 169 F.3d 933, the Court upheld the use of earlier armored car robberies as modus operandi evidence based on the following similarities: (1) the robberies occurred in the same city within a "relatively short period of time" (2) during "times

of minimal bank traffic; (3) in each, a vehicle "suddenly pulled up;" (4) the robbers were wearing business casual clothes, but not masks; (5) the robbers in two of the robberies wore sunglasses, as did one of the two robbers in the third; (6) each occurred outside a bank while funds were being transferred to an armored car; (7) the only witnesses were bank or armored car employees; (8) the employee in control of the money was assaulted in each robbery; and (9) the getaway vehicle was abandoned in each case. *Id.* at 939.

Some of the similarities among the robberies in *Guerrero* were either relatively generic (such as factors (3) and (5)), or more or less outside the control of the robbers (such as factor (7)). Yet the Court still found that the evidence had a "*modus operandi* or signature quality, sufficiently establishing that the same group was involved in all three robberies." *Id.* In a later case stemming from the same crime spree, the Fifth Circuit upheld the introduction of evidence of an uncharged robbery when the only characteristics it shared with the charged crime were the race of the perpetrators, the use of guns, the use and later abandonment of a vehicle, and the fact that they both occurred during times of low bank traffic. *United States v. Castaneda*, CRIM.A. No. 05-41864, 2007 WL 836932, at *4 (5th Cir. Mar. 15, 2007) (per curiam) (unpublished). In that case, the uncharged crime was an armored car robbery, while the charged crime was the

robbery of a bank itself.  *Id.* at *1.  If the similarities were sufficient to admit evidence of the uncharged robbery in that case, much more so are they here.

The second prong of the *Beechum* analysis requires the Court to determine whether the probative value of the evidence is substantially outweighed by the risk of unfair prejudice.  It is true that the Government already has testimonial evidence linking Porter to the charged robberies.  However, by pleading not guilty, Porter has placed his identity as one of the perpetrators squarely at issue, and the earlier bank robberies are clearly probative of identity.  Moreover, evidence of earlier crimes need not be excluded merely because the government has direct evidence of the charged offense.  *See United States v. Powers*, 978 F.2d 354 (7th Cir. 1992) (upholding introduction of evidence of prior bank robberies when the Government had photographs and witnesses of the defendant's involvement in the charged crime). As discussed above, the uncharged robberies occurred within a year and a half of the charged crimes, and are certainly not so remote as to diminish their probative value.  The prejudicial effect of the three uncharged robberies in *Cavallino* was not so great as to warrant their exclusion; nor is it here.

Evidence of the earlier robberies is also admissible to prove intent.  In *United States v. Roberts*, 619 F.2d 379 (5th Cir. 1980) the Fifth Circuit held:

22

Charges of conspiracy involve considerations not present in other criminal prosecutions. The offense of conspiracy requires an element of intent or knowledge which is often difficult to prove. Because the prosecution must prove that the defendant knowingly joined a plan to commit a crime, evidence that establishes a defendant's participation in a criminal act, or evidence establishing his association with co-conspirators, may be insufficient to support the inference that the defendant voluntarily joined a conspiracy to commit a crime. . . . Unequivocal evidence that a defendant committed a substantive offense may justify the inference that he intended to do so, but it does not plainly support the conclusion that he agreed and planned with others to commit the crime.

*Id.* at 382-83 (citations omitted). By pleading not guilty to a conspiracy charge, Porter has placed his intent to enter the agreement at issue, and the evidence is therefore relevant for that purpose.

Again, *Beechum*'s second prong requires an analysis of the evidence's probative value relative to its prejudicial effect. In *United States v. Jackson*, 339 F.3d 349, 356 (5th Cir. 2003), the Fifth Circuit distinguished *Roberts* on this point and held that the district court had abused its discretion by admitting the defendant's earlier theft conviction as evidence of his intent to enter a conspiracy to transport stolen jewelry. The Court noted that unlike in *Roberts*, there was other substantial evidence of Jackson's intent to enter the conspiracy. *Id.* It also found *Roberts* inapposite because Jackson, unlike Roberts, never claimed that he was an ignorant participant in the scheme.

23

Rather, Jackson's defense was the he was not involved at all.

*Id.*  The Court concluded:

> The prior conviction in this case had very little probative value when considering the other evidence going to intent and the nature of Jackson's defense but the potential to cause unfair prejudice was substantial. . . . Here, where the threshold issue was one of identity, there was great danger that the jury would decide that Jackson was involved in the conspiracy because of his prior criminal conduct. This is precisely the inference Rule 404(b) forbids.

*Id.*

Here, as in *Jackson*, the Government has independent testimonial evidence going to Porter's intent.  Moreover, Porter has indicated that he will claim not that he was an ignorant participant in the conspiracy, but rather that he was not a participant at all.  For these reasons, the uncharged bank robberies have less value in terms of proving Porter's intent to enter the robbery conspiracy.  As discussed above, however, the uncharged robberies are highly probative of other matters, such as modus operandi and the origins of the conspiracy.  No further undue prejudice will result from the Government using this independently admissible evidence for the additional purpose of proving intent.  Moreover, even when the defense mounts a theory of nonparticipation rather than ignorant participation, the Fifth Circuit has indicated that evidence of other crimes will satisfy *Beechum*'s second prong if the Court issues a proper limiting instruction.  *United States v. Cisneros*, 414 F. App'x 696, 701-02 (5th Cir. 2011) (per curiam) (unpublished).  *See also United*

24

*States v. Garcia Mendoza*, 587 F.3d 682, 689 (5th Cir. 2009)
(upholding admission of testimony regarding defendant's earlier
drug transactions as evidence of intent to enter drug conspiracy,
despite defendant's assertion that he was not involved the
conspiracy, when the district court had given "a careful limiting
instruction").  Accordingly, the Government may use evidence of
the prior bank robberies to meet its burden of showing Porter's
intent to enter the conspiracy.

### B.   Acquisition of the Stolen Car

The Government also seeks to introduce evidence against all
four defendants showing that Porter acquired a stolen vehicle for
use as a getaway car in the 2011 robberies.  It alleges that
Porter "used his associates to secure a vehicle . . . from an
individual who had failed to return it to a rental car company
and was also given a temp tag belonging to still another vehicle
to obscure its source."  Despite its claim that Porter's
acquisition of the car was "equally attributable to all the
charged defendants," the Government makes no mention of the other
defendants' involvement in obtaining the vehicle and does not
articulate whether the car was acquired by Porter before or after
the conspiracy was allegedly formed.  Lodrig has objected to the
admission of the evidence against him, arguing that the car was

acquired, if at all, before he is alleged to have joined the conspiracy.

In this circuit, acts committed in furtherance of a charged conspiracy are themselves part of the conspiracy. *United States v. Bribiesca*, 189 F.3d 467 (5th Cir. 1999) (unpublished). Moreover, each defendant is responsible for the prior acts of his coconspirators–even those acts completed before he joined the conspiracy–so long as the act was performed after the formation and in furtherance of the conspiracy. *United States v. Porter*, 542 F.3d 1088, 1093 & n. 3 (5th Cir. 2008) (quoting *United States v. Barksdale-Contreras,* 972 F.2d 111, 114 (5th Cir.1992)).  The trouble here is that the Government has presented no evidence indicating whether Porter is alleged to have obtained the stolen vehicle before or after the conspiracy's formation.  Evidence of the car's acquisition therefore will be admissible against Porter's co-defendants only if the Government establishes that Porter acquired the car in furtherance of the conspiracy, *after* its formation.

On the other hand, evidence that the coconspirators used the stolen vehicle in carrying out the robberies is admissible against each defendant.  This is true regardless of whether each defendant was aware of the car's illicit origin, provided that at least one defendant knew. *See United States v. Barksdale-Contreras*, 972 F.2d 111, 114 (5th Cir. 1992) (upholding

kidnapping conviction of late-joining conspirator who denied knowledge that the victim had been moved in foreign commerce, an essential element of the crime).

### C.   Lodrig's Alleged Money Laundering

Lodrig also objects to the use against him of evidence of his alleged money laundering activities, although apparently only for the purposes of Counts One, Four, Five and Six, and not as to Count Seven, the money laundering conspiracy charge.

The Government does not specify to which charges it believes the evidence is relevant. Count Six, however, charges Lodrig with participation in a conspiracy to conceal from law enforcement the source of the dye-stained funds obtained in the August 26, 2011 robbery.  Specifically, the Government alleges that Lodrig and others concocted a story about receiving the money from an unknown individual at the Duck Off Bar who told them to exchange the bills at a casino in exchange for a cut of the money. Evidence that Lodrig did in fact exchange the dye-stained bills at a casino is "inextricably intertwined" with his alleged agreement to lie to police officers about the source of the funds after they were laundered. *See Williams*, 900 F.2d at 825.  The evidence is also a "necessary preliminary" to the crime charged, because Lodrig would have no reason to lie about the source of funds he allegedly exchanged at the casino if he had not actually

done so.  *See id.*  Accordingly, the evidence is intrinsic not only to Count Seven, the money laundering conspiracy charge, but also to Count Six, which corresponds to the alleged agreement to lie about the laundering activity.  It is therefore admissible for those purposes.

## III. CONCLUSION

For the foregoing reasons, the Court admits evidence of the four prior bank robberies as intrinsic evidence of the conspiracy, or in the alternative, as extrinsic evidence going to identity and intent.  The Court withholds judgment as to whether the acquisition of the stolen vehicle is admissible against defendants other than Porter, which depends on whether Porter acquired the vehicle before or after the formation of the alleged conspiracy.  Evidence that the stolen vehicle was used by the conspirators to commit the charged robberies is admissible against all parties.  Finally, evidence of Lodrig's alleged laundering of the dye-stained bills is admissible against him for the purposes of proving Counts Six and Seven.

New Orleans, Louisiana, this <u>17th</u> day of October, 2013.

SARAH S. VANCE
UNITED STATES DISTRICT JUDGE